# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| IMPERIAL CRANE SALES, INC | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 15 C 859 |
| | ) | |
| SANY AMERICA, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

**CHARLES P. KOCORAS, District Judge:**

Before the Court is Defendant Sany America, Inc.'s ("Sany") Motion to Vacate $1,475,000 of Arbitrator John Sherrill's ("Sherrill") March 2, 2017 award of $1,790,292 million to Plaintiff Imperial Crane Sales, Inc. ("Imperial"). For the following reasons, Sany's motion is denied.

## BACKGROUND

This action stems from a July 5, 2011 distributor agreement (the "Distributor Agreement") that underlied Imperial's purchase and distribution of heavy cranes manufactured by Sany. From March 2011 through December 2011, Imperial issued three purchase orders with Sany: (1) an order for a Crawler Crane on March 17, 2011, ("March Order") delivered to Imperial in the first half of 2011; (2) an order for a collection of rough-terrain cranes ("RTCs") on November 16, 2011 ("SPO #1"), six of

which were delivered in early 2012; and (3) another order for a collection of RTCs on December 29, 2011 ("SPO #2").

Imperial sued Sany following this trio of purchases, alleging "breach of express warranty, breach of implied warranty of merchantability and usage of trade, implied warranty of fitness for particular purpose, and breach of contract." Concerning the March Order, Imperial claimed that Sany breached express and implied warranties of merchantability and fitness for a particular purpose. Imperial also alleged that the first six RTCs delivered pursuant to SPO #1 were defective. Imperial rejected these cranes and mutually agreed with Sany to cancel delivery of the remaining RTCs purchased under SPO #1 and SPO #2.

On May 5, 2013, Sany terminated the Distributor Agreement. Imperial then sued Sany in the Circuit Court of Illinois, seeking damages for the difference between the Crawler Crane's promised value and its actual value at the time of delivery, as well as for Imperial's cost in purchasing and renting other cranes to cover for the failed SPO #1 and SPO #2. Sany removed the case to federal court on diversity grounds. Though it would have preferred to litigate its claims in court, Imperial filed for arbitration "in the alternative" to avoid the expiration of a statute of limitations. In response, this Court stayed the action and referred the case to the American Arbitration Association ("AAA"). On July 15, 2015, we requested that an "[a]rbitrator determine whether the case should proceed in arbitration because the

arbitration provision in the Distributor Agreement was applicable, or, if not, to return the case to the District Court for decision."

Imperial and Sany filed competing motions with Arbitrator Sherrill to stay and compel the arbitration, respectively. Contesting Sany's Motion to Compel Arbitration, Imperial argued that the claims fell outside the Distributor Agreement's arbitration provision and that the case should return to the district court because: (i) the three purchase orders were "separate and distinct" purchase contracts; (ii) the March Order predated the Distributor Agreement; and (iii) the Distributor Agreement terminated in May of 2013.

In a September 3, 2015 order ("2015 Ruling"), Sherrill disagreed. Dispensing quickly with the RTC purchase orders, Sherrill found that SPO #1 and SPO #2 were clearly subject to the Distributor Agreement's arbitration provisions because they were agreed to following the Distributor Agreement's execution.

Sherrill devoted a more in-depth discussion to the March Order, noting that the March Order was expressly made subject to a "Floorplan Financing Agreement." That financing agreement, according to Sherrill, required "that a Distributor Agreement should be in place between the parties before delivery of [the Crawler Crane]." Once in place, the Distributor Agreement stated that "this agreement…and purchase orders constitutes the entire agreement of the parties hereto with respect to subject matter herein and therein, and supersedes all prior oral or written arrangements." This, Sherrill concluded, was enough to find that all three purchase

3

orders were "far more than tangentially related" to the Distributor Agreement, and the "broad and expansive language of the arbitration clause necessarily encompasses them." Sherrill granted Sany's Motion to Compel arbitration, and the parties proceeded to discovery.

At the close of discovery, Sherrill held a five-day evidentiary hearing on the merits. On March 2, 2017, Sherrill issued an award ("2017 Ruling") in favor of Imperial for $1,790,292. $1,475,000 of the award flowed from the March Order.[1] Sherrill determined that Georgia law and the Distribution Agreement's own language favored a finding that the March Order, and not the Distribution Agreement, formed the basis for the original bargain between the parties. Despite the Distribution Agreement's role in governing the overall relationship of the parties, Sherrill found that the warranties of the March Order that induced Imperial's purchase of the Crawler Crane were unaffected by the limiting language of the Distributor Agreement.

On March 23, 2017, Sany filed this Motion to Vacate the $1,475,000 portion of the award. Sany contends that Sherrill's 2015 Ruling, which found that the Distributor Agreement governed the overall relationship of the parties, constituted a final ruling. Therefore, Sherrill should have been precluded from finding that the March Order, instead of the Distributor Agreement, formed the basis for the original Crawler Crane bargain. Sany argues that this determination in the 2017 Ruling exceeded the scope of Sherrill's powers and warrants vacation of Imperial's award.

---

[1] Sany challenges only the $1,475,000 award for the March Order, and not the $315,292 for SPO #1 and SPO #2.

4

## LEGAL STANDARD

Federal courts are tasked with a very limited role in their review of an arbitration decision, distinct from the manner in which an appellate court reviews a lower court's decision. *United Paperworks, Int'l Union, AFL-CIO v. Misco, Inc.*, 484 U.S. 29, 36, 38 (1987). "If parties could take 'full-bore legal and evidentiary appeals,' arbitration would become 'merely a prelude to a more cumbersome and time-consuming judicial review process.'" *Oxford Health Plans LLC v. Sutter*, 133 S.Ct. 2064, 2068 (2013) (quoting *Hall Street Associates, LLC v. Mattel, Inc.*, 552 U.S. 576, 588 (2008)). Therefore, under the Federal Arbitration Act ("FAA"), "courts may vacate an arbitrator's decision 'only in very unusual circumstances.'" *Id*. (quoting *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 942 (1995)). The FAA provides district courts with just four statutory grounds for vacating an arbitration award. Sany's motion martials only one such ground: that Sherrill exceeded his powers in the 2017 Ruling. 9 U.S.C.A. § 10(a)(4).

"A party seeking relief under § 10(a)(4) bears a heavy burden." *Oxford Health Plans LLC*, 133 S.Ct. at 2068. It is not enough "to show that the [arbitrator] committed an error—or even a serious error." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010). Indeed, the sole question for a reviewing court is "whether the arbitrator (even arguably) interpreted the parties' contract, not whether he got its meaning right or wrong." *Oxford Health Plans LLC*, 133 S.Ct. at 2068.

## DISCUSSION

**I. Sherrill's 2015 Ruling was Confined to the Issue of Arbitrability and not Subject to Redetermination on the Merits**

Sany's most thorough argument is that the 2017 Ruling, which found that the March Order formed the basis for the original Crawler Crane bargain, "substantially changed" and "completely disregarded" the 2015 Ruling. Sany correctly points out that, if the 2017 Ruling discredited the 2015 Ruling and redetermined an already-issued final ruling, Sherrill would have violated AAA Rule 50 and the common law doctrine of *functus officio*. AAA Rule 50 states that an "arbitrator is not empowered to redetermine the merits of any claim already decided." AAA Rule R-50. This codifies the *functus officio* doctrine, which "holds that 'after a final decision by an arbitrator, the arbitrator…lacks the power to reconsider or amend the decision.'" *Cuna Mut. Ins. Soc'y v. Office & Prof'l Emps. Int'l Union, Local 39*, 443 F.3d 556, 565 (7th Cir. 2006) (internal citations omitted).

Sherrill, however, did not issue a final ruling on the merits in 2015. Rather, he delivered a jurisdictional order rooted in the arbitration clause of the Distribution Agreement. AAA Rule 7, cited by Sherrill in his 2015 Ruling, grants an arbitrator the power to rule on his own jurisdiction. AAA Rule R-7(a). It also extends to arbitrators the power to consider an arbitration clause "independent of the other terms of the contract." AA Rule R- 7(b).

6

As Imperial highlights, the common law is synchronous with the AAA Rules. Fifty years ago, the Supreme Court decided that, except where the parties otherwise intend, "arbitration clauses as a matter of federal law are 'separable' from the contracts in which they are embedded." *Prima Paint Corp. v. Flood & Conklin MFG Co.*, 388 U.S. 395, 402 (1967). This sentiment has been consistently reaffirmed over the last five decades. *See Buckeye Cashing, Inc. v. Cardegna*, 546 U.S. 440, 445 (2006). ("as a matter of substantive federal arbitration law, an arbitration provision is severable from the remainder of the contract"); *see also Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 72 (2010) (citing *Prima Paint* and *Buckeye* for the proposition that contracts with affixed arbitration clauses are separable from those clauses).

Sherrill's 2015 Ruling is in line with the governing law. Immediately before his substantive discussion, Sherrill articulates the legal standard used in "making the determination of whether an *arbitration provision* covers the claims brought" (emphasis added). He then comments on the broad nature of § 5.8 of the Distribution Agreement, the arbitration clause, which "covers all matters 'arising out of' and 'relating to' the parties' agreement." This comment is clearly confined to the arbitration provision, and not the Distribution Agreement in its entirety. Sherrill also cites Seventh Circuit law that supports reading a "broad arbitration provision" to cover "pre-agreement purchase orders." Nowhere in the preliminary discussion of his legal analysis does Sherrill comment on anything but the operation of arbitration clauses, in and of themselves.

7

Sherrill's substantive discussion is concededly more muddled than his legal discussion, but he remains careful to confine the 2015 Ruling to the arbitrability of the dispute, and nothing more. Sany relies heavily on Sherrill's reference to § 5.2(a) of the Distributor Agreement, entitled "<u>Entire Agreement; Amendments; Conflict of Terms.</u>" Sherrill finds that § 5.2(a)'s broad language rendered the Distributor Agreement "the overarching agreement that covered the commercial relationship of these parties concerning the purchase of this equipment…." The Court acknowledges that this language, taken in isolation, lends itself to a reading that the Distributor Agreement is the end-all-be-all of the contractual dealings between Sany and Imperial. Such a reading, however, is devoid of context.

Sherrill's determination, that the Distribution Agreement covers the parties' commercial relationship, is preceded by his aforementioned discussion of the legal framework applicable to arbitration clauses. It is within this context that Sherrill considers § 5.2(a). It is not Sherrill's conclusion that § 5.2(a) settles the merits of every quarrel between the parties. Rather, § 5.2(a) predicates Sherrill's rational deduction about the relationship between the parties' purchase orders and the Distribution Agreement: that because § 5.2(a) clarifies the scope of the Distribution Agreement, it inescapably informs the expansive language of the arbitration clause. Sherrill makes this explicit at the end of his substantive discussion.

> [B]ecause the purchase orders were the direct, referenced, incorporated and anticipated result of the parties' sole relationship and underlying contract, they are so closely related to the Distributor Agreement that *the*

8

> *broad and expansive language of the arbitration clause necessarily encompasses them.* (emphasis added)

This is the critical finding of the 2015 Ruling, that the Distributor Agreement incorporates the purchase orders to such an extent that its arbitration clause necessarily contemplates and encompasses each order. It is not, as Sany contends, a finding that the Distributor Agreement itself governs each and every aspect of the parties' unique transactions.

Sherrill's construction of the Distributor Agreement is not dissimilar from that undertaken by the Seventh Circuit in *United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Service Workers Int'l Union v. Trimas Corp.*, 531 F.3d 531 (7th Cir. 2008). The fundamental question of *United Steel* is distinct from the instant matter. However, its preliminary determination of dispute arbitrability is instructive.

The boilerplate arbitration clause at issue in *United Steel* subjected "[a]ny alleged violation or dispute involving the terms of this Framework Agreement" to arbitration. *United Steel*, 531 F.3d at 536. The court's threshold inquiry turned on whether the "Rieke" manufacturing plant was a "covered workplace" such that any of its workforce's labor disputes would compel arbitration. *Id.* at 537. Lo and behold, the arbitration clause itself did not define "covered workplace," so the court had to scour the remainder of the contract. There, the court found that two separate sections operated to define "covered workplace" explicitly enough to render the arbitration provision inclusive of the Rieke plant. The court explained that it "makes no

9

difference that [the agreement] does not list the specific plants that it covers; it provides arbitrable criteria by which that determination can be made." *Id*. The court reiterated the *Prima Paint* separability notion, issued its jurisdictional order, and stated, "Once the existence of the agreement to arbitrate is established, questions about the enforceability of the underlying contract are left to the arbitrator." *Id*. at 538.

Sherrill's consideration of § 5.2(a) is analogous to the *United Steel* analysis, and we reiterate the Seventh Circuit's reasoning here. Sherrill's consideration of § 5.2(a) was a useful and proper tool in his ultimate conclusion of § 5.8, the arbitration provision. Section 5.2(a) helped clarify the extent of the arbitration clause, but it takes on no greater a role in the 2015 Ruling than that. As did the Seventh Circuit, Sherrill looked beyond the arbitration provision to determine the breadth of that clause's scope; doing so does not invalidate the arbitration clause's operationally severable function from the remainder of the contract.

The Court finds that the 2015 Ruling limited its finding to the arbitrability of Imperial and Sany's dispute. Any final judgments on the merits were left for a future date. Sherrill did not exceed his powers in his 2015 Ruling.

## II. Sherrill Properly Interpreted the Contracts at Issue

Sany then argues that Sherrill's 2017 Ruling improperly found that "the [March Order], not the [Distributor Agreement], formed the basis for the original bargain between the parites, which included express and implied warranties that were made

prior to and at the time of the sale." This finding, Sany contends, is fundamentally inconsistent with the 2015 Ruling, failed to draw its essence from the agreement between the parties, and warrants vacation of the award as an action in excess of Sherrill's powers.

We disagree. A large chunk of Sany's argument on this point relies on the assumptions of its now-rejected contention, that the 2015 Ruling was a final judgment on the merits that rendered the Distribution Agreement the exclusive governing document of the Crawler Crane purchase. Therefore, we now review Sherrill's 2017 Ruling consistent with our finding that the 2015 Ruling was confined to the arbitratibility of the dispute under § 5.8, the 2015 Ruling issued a valid finding on § 5.8, and § 5.8 is severable from the remainder of the Distribution Agreement. *See Nitro-Lift Techs., LLC v. Howard*, 568 U.S. 17, 21 ("the validity of the remainder of the contract (if the arbitration provision is valid) is for the arbitrator to decide"). As long as the 2017 Ruling even arguably interpreted the parties' contracts, the award will stand. *Oxford Health Plans LLC*, 133 S.Ct. at 2068.

In his 2017 Ruling, Sherrill directly discusses the interwoven relationship of the March Order and Distributor Agreement. He also acknowledges the conflict between the warranties of the March Order and the limiting language of the Distributor Agreement that sought to undo those very warranties. Sherrill finds that the Distributor Agreement itself, however, instructs how to resolve such conflicts:

> The [Distributor Agreement] also states that the terms of the [purchase orders] override any contradictory terms in the [Distributor Agreement], and the [March Order] did not contain similar limitations of warranties.

Sherrill also considers resolution of the conflict under governing Georgia law, which disfavors subsequent contractual language that seeks to limit or exclude prior warranties. From the 2017 Ruling:

> [E]xclusion and limitation of warranties is not favored under Georgia Law (which governs this transaction under the provisions of the [Distributor Agreement]), and I find that the warranties extended at the time of the sale that initially induced Imperial to purchase [the Crawler Crane] cannot be retroactively excluded or limited, even though Imperial later agreed to and signed the [Distributor Agreement].

Sherrill demonstrated clear-headed analysis by examining each contract at issue under a lens of relevant law and policy. We find that Sherrill properly considered all relevant contracts and based his final award on an interpretation of the same.

### III. Sherrill Properly Limited Imperial's Award to Direct Damages

Finally, Sany contends that Sherrill exceeded his powers by awarding Imperial Crane consequential damages in violation of the express language of the Distributor Agreement.

Section 5.8 of the Distributor Agreement states, "the arbitrator shall not be authorized to award any consequential, exemplary, or punitive damages." Contract law "distinguishes between direct and consequential damages, the difference lying in the degree to which the damages are a foreseeable (that is, a highly probable) consequence of a breach." *Rexnord Corp. v. DeWolff Boberg Assocs.*, 286 F.3d 1001,

1004 (7th Cir. 2002).  The Uniform Commercial Code defines each.  Consequential damages:

> (a) any loss resulting from general or particular requirements and needs of which the seller at the time of contracting had reason to know and which could not reasonably be prevented by cover or otherwise; and (b) injury to person or property proximately resulting from any breach of warranty.  U.C.C. § 2-715(2).

Direct Damages:

> [T]he difference at the time and place of acceptance between the value of goods accepted and the value they would have had if they had been as warranted, unless special circumstances show proximate damages of a different amount.  U.C.C. § 2-714(2).

Sany argues that Arbitrator Sherrill exceeded his power under AAA Rule 47(a) because he granted Imperial consequential damages when he considered "all of the relevant factors," including "the limitations on the use and consequent income of the [Crawler Crane] because of its condition."

We disagree, and find that Sherrill properly limited his award to direct damages.  Sherrill makes clear in his 2017 Ruling that when he determined Crawler Crane's warranty damages, he took the "difference between the 'promised value' and the 'actual value' of the [March Order] at the time of delivery."  This is little more than a plain recitation of the UCC's definition of direct damages.

Sherrill's mention of "consequent income," on the other hand, borders on dicta. Its inclusion was a remark on one of the many factors that an expert appraiser used in arriving at his conclusion about the value of the Crawler Crane at the time of delivery.

It did not purport to represent the manner in which Sherrill was determining damages. Rather, Sherrill explicitly rejected any approach other than a dispensation of direct damages, stating, "I find that it would not be appropriate to add any additional amount of damages for cost of repairs, shipment, loss of profit, or other damages, as sought by Imperial." We find that Sherrill did not improperly award Imperial consequential, exemplary, or punitive damages.

### IV. Imperial is Entitled to Recover Reasonable Attorney's Fees

Finally, the Court addresses Imperial's request to recover attorney's fees for having to defend against Sany's Motion to Vacate. There are "*two* bases to deviate from the American rule that each party bear its own fees: (1) statutory authority for fee shifting and (2) contractual agreement between the parties" (emphasis in original). *Harter v. Iowa Grain Co.*, 220 F.3d 544, 557 (7th Cir. 2000). As to the first, there is no statutory authority present here. "[T]he Federal Arbitration Act does not authorize a district court to award attorney's fees to a party who successfully confirmed an arbitration award in federal court." *Id*.

The second basis, however, favors Imperial. In *Harter*, the Seventh Circuit affirmed a corporation's award of attorney's fees incurred in its successful defense against a seller's motion to vacate an arbitration award. *Id*. at 558. The contract at the heart of the case stated that, in the event of the seller's failure to fulfill the contract, the seller would be "liable for [the corporation's] attorney fees, cost of collection, plus interest." The contract went unfulfilled, an arbitration award was awarded, and the

corporation incurred expenses defending against the seller's subsequent motion to vacate. Therefore, the corporation was entitled to "seek reimbursement from the district court for fees expended in that defense." *Id*.

The *Harter* court's logic applies with equal precision here. Sany desired arbitration, received that arbitration, did not like the result of that arbitration, and then contested the results of arbitration. Arbitration is the constant; it is the reason we are here. Section 5.8 of the Distribution Agreement plainly states that the "expenses of arbitration (including, without limitation, the prevailing party's attorney fees and expenses) shall be borne by the non-prevailing party." The *Harter* contract did not even include the word arbitration, and yet the Seventh Circuit found that it naturally contemplated the defense of such an award. Here, the contract is unambiguous. Imperial incurred expenses defending Sany's Motion to Vacate an arbitration award. This seems just the sort of expense anticipated by § 5.8. Imperial is entitled to recover reasonable attorney's fees incurred in its defense of the Motion to Vacate.

## CONCLUSION

Based on the foregoing, Sany's Motion to Vacate is denied in its entirety, and Imperial's Motion to Confirm the award and its fees are granted. It is so ordered.

DATED: Sept. 28, 2017

_____
Charles P. Kocoras
United States District Judge